MARY JANE SMALLWOOD and PATRICIA SMALLWOOD, Appellants,
Respondents, *v.* OVERSEAS STORAGE COMPANY, INC., Defendant,
and EQUALSHARES, INC., CYRIL J. BROWN and THEODORE K.
MCCARTHY, Respondents, Appellants.

Second Department, April 6, 1942.

*Kenneth M. Spence* [*Stewart W. Bowers* with him on the brief], for the appellants, respondents.

*Adolph Feldblum* [*Louis E. Goldstein* and *Philip Feldblum* with him on the brief], for the respondents, appellants, Equalshares, Inc., and Theodore K. McCarthy.

*Milo Otis Bennett* [*John H. Munley* and *George J. Meade* with him on the brief], for the respondent, appellant, Cyril J. Brown.

CARSWELL, J. In 1930 the law firm of McCarthy & Brown was the legal adviser of plaintiffs' mother, the guardian of their property. Certain mortgage certificates of plaintiffs were sold that year and $35,000 assembled. This sum was invested, through the law firm, on July 10, 1930, in two co-ordinate first mortgages of $17,500, due July 1, 1933; one for each of plaintiffs' estates, respectively. They were secured by a storage warehouse property in Staten Island owned by the defendant Overseas Storage Company, Inc., hereinafter called "Overseas." The law firm received $3,500 net from "Overseas" for obtaining the mortgage loan and representing it. The guardian knew that the expenses of the mortgage were to be borne by "Overseas," but was not informed as to the amount which the law firm was to receive.

A second mortgage of $10,000 was placed on the same parcel by "Overseas" through McCarthy & Brown on November 12, 1931. The lender was Equalshares, Inc., a corporation with fully

paid capital stock of $45,500, of which $3,000 was owned by McCarthy and $3,000 by Brown. McCarthy was the president of Equalshares, Inc., and McCarthy and Brown were two of the three directors. "Overseas" paid $2,500 for expenses on this loan; $1,000 was retained by McCarthy & Brown and $1,500 was turned back to Equalshares, Inc., as "discount." The balance was used to pay accrued taxes and to construct a gasoline station on the property.

On June 1, 1932, the law firm was dissolved and Brown continued as lawyer for the plaintiffs' estates, he having theretofore handled their affairs. "Overseas" defaulted on both first and second mortgages, whereupon Equalshares, Inc., paid the interest on the first mortgages and as second mortgagee foreclosed and bought the property on June 18, 1932.

Plaintiffs' guardian agreed as of July 1, 1933, to reduce the interest rate on the first mortgages from six per cent to five per cent, McCarthy acting for Equalshares, Inc., and Brown representing plaintiffs' guardian. The mortgages were continued as open mortgages from July 1, 1933, to May 14, 1935. On the latter date plaintiffs' guardian sought and obtained, despite the existing moratorium act, a payment of principal of $2,500 for each plaintiff. At the same time she agreed to reduce the interest to four per cent and to extend the principal due date to July 1, 1938, and Equalshares, Inc., obligated itself to pay the principal of each mortgage.

In 1937 defendant Brown ceased to represent plaintiffs' guardian. On April 6, 1938, she sought and obtained for the plaintiff Mary Jane Smallwood (who came of age on June 9, 1937) $3,000 of the principal of her mortgage from Equalshares, Inc., and it agreed to make quarterly amortization payments of $125 on each mortgage. The rate of interest was continued at four per cent, and both mortgages were extended from July 1, 1938, to July 1, 1943. The agreement was executed, under the supervision of a lawyer named Feeley, by Mary Jane Smallwood and the guardian of Patricia Smallwood. On December 28, 1939, plaintiff Patricia Smallwood attained her majority.

On June 21, 1940, this action was begun in equity based on the contention that the individual defendants, on the foregoing occasions, breached their respective duties to plaintiffs.

It is plaintiffs' theory that their estates were despoiled by alleged fraudulent conduct, in effect a conspiracy, of the individual defendants Brown and McCarthy, they using, at times, the corporate defendant Equalshares, Inc.

(1) A rational appraisal of the evidence discloses that there was no conspiracy. Such breaches of duty as occurred were the result

of a mistaken notion by the individual defendants as to the nature, extent and scope of their obligations. This conclusion flows from an evaluation of the testimony adduced on behalf of plaintiffs (the controlling portion of which related to matters occurring ten or more years ago), in the light of the poor memory of plaintiffs' chief witness, the documentary evidence, the proof adduced on behalf of the defendants, and common knowledge prevalent at the times the incidents occurred, which plaintiffs seek to capitalize.

(2) As to the $3,500 purportedly paid as a fee for services rendered to " Overseas:" When this loan was consummated, the law firm acted for " Overseas," while under retainer on behalf of plaintiffs' estates. They thus undertook to act for adverse or conflicting interests, as between the borrower and the lender. The type of the security and the money market conditions affecting it, enveloped a further conflict of interest. This conflict arose, between the plaintiffs' estates and the law firm, from the hazard to the lenders and the amount of the " fee," which latter, possibly unwittingly, was a factor with a potentially malign influence.

The general rule is that a lawyer may not represent adverse interests or undertake to discharge conflicting duties. There are exceptional instances when he may do so, when the conflict of interests is nominal or negligible, or where there has been complete disclosure. Except in the latter instance, acting for conflicting interests is always fraught with peril. (*Eisemann* v. *Hazard*, 218 N. Y. 155, 159.) A lawyer, in the absence of a complete disclosure, may not act for conflicting interests where a disadvantage or detriment arises, or is likely to arise, to one of the interests for which he acts. This is so irrespective of the suffering of damage in the ordinary sense. If the propriety of so acting is challenged in a disciplinary proceeding, the presence or absence of loss would bear upon the extent, if any, of discipline. When its propriety is attacked, in an action, in a situation where there has been no damage through loss in the ordinary sense, there may be damage in the form of a detriment suffered, which may have a money value. This is on the theory that the detriment effects a diversion of the property or funds of the client. Here the credible evidence reveals there was a disclosure by the law firm to plaintiffs' guardian that it was acting for " Overseas," and that it would be paid by " Overseas," but there was no disclosure of the amount of compensation. The net amount it received was ten per cent of the loan. The size of this payment can be explained only by the fact that the proposed mortgage loan involved a greater than ordinary hazard to the lenders because it was a loan on a specialty. A lawyer's duty, especially when acting in respect of infants, ordinarily requires

that their moneys be loaned on productive real estate, and without undue concentration in one property. Here these lawyers were under a duty to see that the infants' moneys were invested in reasonably safe mortgages, which ordinarily excludes mortgages on specialties. The obligation they assumed — to act for the borrower — necessarily exposed them to the influence of the amount of the fee exacted from or proffered by the borrower. The size of such a fee was affected by the degree of hazard to the lenders. The character of the hazard justified the exaction from the borrower, but in so far as it was in excess of the ordinary value of the lawyers' services, it belonged to the lenders. A lawyer acting for a lender may not properly enjoy the benefit of a consideration paid because of a hazard to a lender, especially where infants' moneys are involved, where there is no disclosure of the amount thereof. In this case even with a disclosure the guardian would not be absolved, especially if loss ensued. The hazard involved was the determining factor in the amount of the exaction; therefore, the estates furnishing the moneys were entitled to be compensated for taking the risk. It was the risk of loss that furnished the consideration for the exaction and not the element of whether or not a loss eventuated. That this is a correct view is revealed in this record. When a subsequent mortgage was taken on the same property by Equalshares, Inc., there was an exaction of $2,500 from " Overseas " on a $10,000 loan. This transaction involved both the hazard of a mortgage on a specialty and the hazard of a second lien placed under depressing economic conditions. In that instance, however, this same law firm returned $1,500 to Equalshares, Inc., the lender, under the euphonious term " discount," and retained $1,000. Since a corporate borrower was involved on all occasions, no question of usury was involved in respect of the first mortgages or the second mortgage.

It follows, therefore, that the $3,500 taken by the law firm was a diversion, to the extent indicated, of the moneys of the plaintiffs' estates. The amount of the diversion, however, was not the full amount paid by the borrower, because there was a disclosure that the borrower would pay the expenses of the loan, and plaintiffs' estates were to pay nothing. Moreover, it was common knowledge that borrowers are required to pay such expenses. (*Pennsylvania Steel Co.* v. *Title Guar. & Trust Co.*, 193 N. Y. 37.) The amount of the diversion was the sum paid by the borrower, less the reasonable value of the services rendered by the law firm to " Overseas." There is no evidentiary basis for a finding that $3,500, or any other amount, represented the reasonable value of such services. In *Pennsylvania Steel Co.* v. *Title Guar. & Trust Co.* (*supra*) a similar

exaction, while considered large, was not deemed a diversion, because the trial court made no finding to that effect. There the exaction was $11,100 on a $370,000 building loan — about three per cent. Here the charge is ten per cent net. Here there was hearsay, not evidence, that ten per cent was a proper exaction from the borrower, but this did not mean for legal services because of the factors of a specialty being involved and the existing condition of the money market. It is common knowledge that the amount of such an exaction varies in proportion to the degree of hazard involved. The evidence warrants the view that the retention of the entire $3,500 by the lawyers was due to a somewhat widespread but mistaken notion entertained by them as to their rights and duties. They, therefore, should be paid the reasonable value of such services as they rendered to the borrower because they made known to plaintiffs' guardian what she knew as a matter of common knowledge — that they were to receive compensation. A new trial must be had to resolve this issue and to determine the portion of the $3,500 which they must return to plaintiffs' estates.

The fact that moneys placed in this investment, to the extent of $22,000, would have been lost if they had been retained in the prior investment has no material bearing. Likewise, the fact that no loss resulted on the principal of the mortgages as a consequence of the course of action taken by the individual defendants, acting through the corporate defendant Equalshares, Inc., does not affect the right of plaintiffs to be compensated for the hazard to which their estates were subjected, and for which hazard the borrower paid a sum greatly in excess of the usual charge paid by borrowers on ordinary mortgage transactions.

(3) As to the reduction of interest from six per cent to five per cent from July 1, 1933, to May 14, 1935: The law firm was dissolved on June 1, 1932. After that date McCarthy bore no fiduciary relationship to plaintiffs' guardian. Acting as president of Equalshares, Inc., he had a right to seek a reduction of interest because of existing money market conditions and the burdensome experience of Equalshares, Inc., in carrying the property as owner. Therefore, no basis for a judgment against McCarthy on this phase exists in this record.

After June 1, 1932, as theretofore, the defendant Brown handled the affairs of plaintiffs' estates for their guardian. The documentary evidence established that Brown had no real or active part in initiating or effecting the reduction of interest; and the credible evidence established that plaintiffs' guardian exercised an independent judgment in reducing the interest to five per cent. It was a sound exercise of judgment, as she was not in a position,

nor were the plaintiffs' estates, to finance then, or on any other occasion, the taking over of the property under foreclosure, and Equalshares, Inc., was not at that time obligated to pay the principal of plaintiffs' mortgages.

No basis for a judgment against Brown exists on this phase unless it be found as a fact that he did not disclose that he had a $3,000 ownership in Equalshares, Inc., which interest was relatively small in view of the total paid-in capital of that corporation. Brown testified that he so advised plaintiffs' guardian. His testimony in general has support in documentary proof. Plaintiffs' guardian's testimony is that she was not so advised. Her testimony lacks support in documentary proof and is, in general, intrinsically less credible. Therefore, a finding on this record that Brown did not disclose his small stock ownership is against the weight of evidence.

(4) As to the reduction of interest on May 14, 1935, from five per cent to four per cent: For the reasons stated in reference to the prior reduction, no basis exists for an assessment against McCarthy on this phase. The same is true with respect to Brown, with the limitation above stated. There is the added element which operated to plaintiffs' benefit — Equalshares, Inc., assumed the payment of the principal of the mortgages and, in addition, to meet urgent financial needs of the plaintiffs, paid $2,500 to each on account of principal, which payments could not be had as of right because of the moratorium law. The evidence clearly discloses that on this occasion plaintiffs' guardian was the active factor in seeking these moneys and agreeing to reduce the interest, which agreement was a sound exercise of discretion under the circumstances. However, the element of whether Brown's adverse interest was made known must be relitigated for the reasons above stated.

(5) As to the final extension of the mortgages on April 6, 1938: On this occasion plaintiffs and their guardian acted on the basis of independent supervision and legal advice. The transaction involved no element of fiduciary relationship in respect of either McCarthy or Brown. Whatever was then done may not be invoked as against any of the defendants. As the interest was continued at four per cent, the incident has significance only in connection with the claims in respect of the two prior interest rate changes, and the effect thereon, if any, of Brown's stock interest, as well as the probability of disclosure thereof.

(6) As to the claim of breach of duty when Equalshares, Inc., made the second mortgage loan to "Overseas:" The second mortgage was placed on the property on November 12, 1931. This was before the dissolution of the law firm on June 1, 1932. There was no duty

on the part of the law firm to take up with plaintiffs' guardian the fact that an application for such a loan had been made and was being acted upon. The making of the loan was an advantage to plaintiffs' estates and not a detriment. It introduced a stronger financial factor into the situation. It safeguarded the first mortgages by providing funds for the payment of overdue taxes and to finance an improvement to increase the potential revenues for carrying the property. The credible evidence establishes that neither at that time nor on any other occasion were the plaintiffs' estates or their guardian in a position to finance foreclosure proceedings or to carry the property, which later became a burdensome matter for Equalshares, Inc. It would not have been a proper exercise of discretion or duty for plaintiffs' guardian to engage in avoidable foreclosure proceedings or to seek possible speculative advantage in so doing. The subsequent history of the property disclosed that if plaintiffs' guardian had embarked on such a course, loss and financial disaster would have been plaintiffs' portion. Instead, with Equalshares, Inc., as owner, the safety of plaintiffs' mortgages was enhanced by the presence of a financially stronger owner than was " Overseas," capable of carrying the property while it was not productive of overhead charges. The course pursued was the proper one from the viewpoint of the best interests of the infants' estates.

(7) As to the foreclosure of the second mortgage of Equalshares, Inc.: This incident involved no breach of duty owing by defendants to plaintiffs. The claim of plaintiffs that their guardian did not have knowledge of the participation of Equalshares, Inc., in the situation, and the claim as to when she had such knowledge, are without support in credible evidence.

The judgment should be reversed on the law and the facts and a new trial granted, costs to abide the event. For the purposes of a new trial all findings of fact and conclusions of law should be reversed.

The foregoing determination makes it unnecessary to review the order specified in the plaintiffs' notice of appeal.

LAZANSKY, P. J., HAGARTY, ADEL and TAYLOR, JJ., concur.

Judgment reversed on the law and the facts and a new trial granted, costs to abide the event.

For the purposes of a new trial all findings of fact and conclusions of law are reversed.

The foregoing determination makes it unnecessary to review the order specified in the plaintiffs' notice of appeal.